# Exhibit "A"

1   Douglas R. Dollinger, Esq., NY Bar No. 2354926
    Appearing *Pro Hac Vice*
2   260 Main Street
    Goshen, New York 10924
3   Tel:   845.915.6800
    Fax:.  845.915.6801
4   e-mail: ddollingeresq@gmail.com
5   Attorney for Plaintiff

6   Seth D. Heyman. Esq., CA Bar No. 194120
    2600 Michelson Drive, Suite 900
7   Irvine, CA 92612
    Tel: 855-439-6628
8   Fax: 855-207-3967
9   Email: sdh@heymanlegal.com
10  Attorney for Plaintiff

11                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
12                         OKLAND DIVISION

13

14  Indiezone, Inc., a Delaware corporation, and        ) Case No. 3:13-cv-04280 YGR/EDL
    EoBuy Ventures Limited, an Irish private limited company, ) Jury Trial Is Demanded
15
                                                          ) 15 U.S.C.  §§1114-1117 and1125(a),(d);
16                      *Plaintiffs,*                      ) 17 U.S.C.  §§501-506(a)(1)(A);
                    vs.                                    ) 18 U.S.C.  §1030(a)(2)(C),(a)(4)a)(5)(C),
17                                                         ) 18 U.S.C.  §§1341 & 1343;
18  Todd Rooke, Joe Rogness, Phil Hazel, Sam Ashkar,      ) 18 U.S.C.  §1832-Theft Trade Secrets
    Holly Oliver and U.S. Bank, collectively the *RICO Defendants*; ) 18 U.S.C.  §§ 1951, 1956 and 1957;
19                                                         ) 18 U.S.C.  §§1961-1968, et seq;
20  Jingit LLC., Jingit Holdings LLC., Jingit Financial Services LLC., ) 18 U.S.C.  §2314;
    Music, Mc, LLC., Tony Abena, John E. Fleming, Dan Frawley. ) 18 U.S.C.  §2319;
21  Dave Moorehouse II, Chris Ohlsen, Justin James,        ) 18 U.S.C.  §2701-11;
    Shannon Davis, Chris Karls in their capacities as officers, ) 28 U.S.C.  §2201(a)Trademark-Patent DJ;
22  agents and/or employees of the Jingit LLC.,            ) 35 U.S.C.  §282-292 Inv. Pat-False Pat;
    *Defendants in Negligence, and Aiding/Abetting;*       ) Prelim. Injuct. Aiding/Abetting; Negligence;
23                                                         ) Fraud/Misrepresentation; Conspiracy; DJ Act.
24  Wal-Mart, General Electric, Target, DOE(s) and ROE(s) 1 ) Misapp. Trade Secrets Cal. Code 34.26.11
    through 10. *Defendants in Negligence Secondary*       ) California Unfair Competition 17200/17500
25  *-Vicarious Infringement,*                             ) Trespass to Chattel; Breach of Contract
                                                          ) Cal Penal Codes §§496 and 502, False Advertising;
26                                      *Defendants.*       ) Const. Trust-Int.-Neg. Interf. w/Buss; Accounting;
27                                                         ) Appt. Referee Conversion of Intel. Property;
                                                          ) False Advertising; Unjust Enrich-Restitution.
28

                                          -- 1 --

    Complaint

## INTRODUCTION

1.    The claims presented in this Complaint comprise allegations of a criminal agreement, a conspiracy, involving the willful-deliberate pre-planned, well-organized and carefully executed theft of Plaintiff **eoBuy's** and Plaintiff **Indiezone's** ("Plaintiff Corporations") separate and joint original in house and filed copyright-works, copyrightable-works, trade secrets, service mark-trade dress and other intellectual property (collectively "**IP**" and from time-to-time "**Property**").

2.    The plan was originally forged between two individuals, each former officers, work-for-hire employees and shareholders of **eoBuy** and/or **Indiezone**; the Defendant **Todd Rooke** ("**Rooke**"), **eoBuy's** Chief Technical and Strategy Officer as well as **Indiezones** former Chief Technical Officer; together with Defendant **Joseph Rogness** ("**Rogness**"), **Indiezone's** former Chief Marketing and Business Development Officer.

3.    **Rooke** and **Rogness** were collaborative in the theft of Plaintiff Corporations unique-proprietary e-commerce micro-billing and payment processing systems for sales, purchases and payment of digital content over the Internet and mobile network systems.

4.    The criminal agreement-scheme commenced by **Rooke** and **Rogness** has been ongoing since September 2008. The first of a series of overt acts escalated into actual predicate criminal acts which were accomplished through a pattern of racketeering activity when in November of 2011, the **RICO Defendants**, acting as principles within the meaning of 18U.S.C §2, all "**Persons**" within the meaning of 18 U.S.C. §1961(3) criminally took control of Plaintiffs' **IP** and are using it in the affairs of new business entities which constitute a **RICO Enterprise** within the meaning of 18 U.S.C. §1961(4) which has and continues to cause damages and injury to Plaintiffs' business and **Property** entitling Plaintiffs to a right of compensation 18 U.S.C. §1964(c).

5.    These acts of infringement, theft, and conversion were accomplished via the US mail and wire transmissions services using related schemes at differing times in acts occurring across state lines, where the primary objective and/or intent of Defendants **Rooke** and **Rogness** was the willful control, destruction and injury of Plaintiffs' business- **Property**

-2-

Complaint

1  involving: 1) theft-conversion of Plaintiffs' **IP**; 2) by the intended control, disruption or

2  interference with the Plaintiffs' planned deployment and commercial release-market entry of

3  their individual and joint **IP**; 3) where the theft, control and disruption of the Plaintiffs' **IP**

4  allowed Defendants **Rooke** and **Rogness** to establish and maintain an unfair competitive

5  advantage over Plaintiffs; 4) which was accomplished with others in the commission of

6  overt/criminal acts which form a pattern of racketeering activity; 5) which provided **Rooke** and

7  **Rogness** the means to falsely claim the ownership of the Plaintiffs' **IP**; 6) allowing Defendants

8  to raise capital through investors series Regulation D offerings by reason of their false claims of

9  ownership; 7) which then allowed them to create and use a series of new corporations using the

10 illegally generated money and activity, reinvesting the money into those corporations which

11 were managed, controlled and owned by them, via a second pattern of racketeering activity; 8)

12 which provided the opportunity for them to file false patents with the USPTO; 9) after which

13 **Rooke** and **Rogness** conspired with and directed certain defendants who agreed, acquiesced,

14 knew or should have known that they were committing acts in a manner forming a pattern of

15 criminal-racketeering activity; 10) and which provided them the means for the systematic,

16 incremental and illegal infringement, misappropriation, deployment and exploitation of the

17 Plaintiffs' **IP** via the Website **Jingit.com**.

18       6.       The Plaintiffs' proprietary content and processing systems exist under a joint

19 licensing and deployment agreement between **eoBuy** and **Indie Zone. Indiezone's** is a unique e-

20 commerce platform and advertising engine consisting of programs, compilations/applications of

21 the **eoBuy** methods and processes enabling advertisers to provide consumers with real-time cash

22 rewards in exchange for their attention and direct engagement.

## BUSINESS MODELS

24 eoBuy's Business Model:

25       7.       **eoBuy's** core business strategy centers around the licensing and deployment of its

26 copyrighted-copyrightable and proprietary payment processing and content monetization

27 platform, a unique process which enables among other things, real-time settlement of fractional

28 transactions in amounts less than .99 cents via the Internet for sales of digital content.

- 3 -

Complaint

8.     The **IP** processes are proprietary and have been in development since 1997, and at least 9 years prior to the Rooke and Rogness obtaining employment as work-for hire employees. **eoBuy's** turnkey, full-service restricted licensing solutions were designed and architected to be available on a systemic-global scale. **eoBuy's** discrete business model was designed and architected to provide a gateway and bridge for the processing of micro e-commerce fractional transactions between consumers, merchants and various Payment Service Providers ("PSP's") or licensees/stakeholders.

9.     The fractional e-commerce segment of market processing exists with significant economic barriers to entry in the processing of transactions below the monetary threshold of $.99 cents.   By using the in-house registered copyright and trade-secret, **eoBuy proprietary IP** solutions, the technological and business parameters for fractional transactions have been engineered in a manner using discrete Code methods and techniques compiled and developed by the company as to provide a viable system for the enablement of micro-payments on any scale.

10.     The **eoBuy** payment platform, for the first time, creates a technology that enables the various players in the financial and e-commerce system to process micro-transactions in a profitable manner. The processes mean hundreds of billions of dollars in revenue to the world economy and better services to users of the Internet.

11.     Due in part to the unprecedented scalability requirements and the next generation business model of the **eoBuy IP** solution, PSPs, merchants and consumers and other members of the e-commerce and financial communities have the  ability to unlock profits in the area of digital distribution and digital commerce.

12.     **eoBuy's** proprietary process is accomplished by applying its' Code in a discrete methodology which allows consumers to participate in fractional purchases, while merchants can effectively control and regulate delivery of goods in fractional sales on an individualized at-will basis with real time settlement of accounts.

**Indiezone's Business Model:**

13.     The **Indiezone** business model was designed around its in-house copyrighted and trade-secreted **Ad-Engine** and next-generation e-commerce platform (in this instance

-4-

tailored specifically to the digital distribution of independent music paid for via engagement with a proprietary compilation of processes-methods accomplished via its unique Ad-Engine application ).

14.   The **Ad-Engine** enables for advertisers to provide consumers real-time fractional cash rewards for online purchases using ad sponsor dollars to pay consumers direct deposits for watching and engaging with their ads.

15.   In exchange for payment the consumer may provide demographic and psychographic feedback to advertising sponsors who in turn can use the information to target consumers thereby eliminating the need for a shotgun approach to market advertising delivery and simultaneously increasing the value of the relationship and thus the amount paid-out to consumers for their attention and engagement.

16.   Cash payment may be in whole dollars or fractional amounts under .99/00 cents.  This area was a previously unprofitable segment of the e-commerce revenue stream-ecosystem. The **Indiezone** system and **Ad-Engine** in particular, enables advertisers to provide consumers with real-time fractional cash rewards in exchange for their attention and engagement.  The system was developed with a unique methodology and processes enabling the direct compensation to consumers with real money and in real time.

17.   The **Indiezone** model simultaneously allows users to instantly bank their earnings and then spend those earnings by way of credit and debit cards.  The task is accomplished via a bank-account or an extension of a bank-account such as a prepaid banking debit card funded via the money earned while using the **Indie Zone Ad-Engine**, in association with banking and settlement partners, (Payment Service Providers "PSPs").

18.   The earned funds can be used by consumers to make digital purchases within the **Indiezone** technological ecosystem or the funds can be redeemed directly deposits to their bank accounts as maintained by Plaintiff banking partners and spent in the real world.

**eoBuy's and Indiezone's Joint Business Model:**

19. The combined technologies and joint deployment of **eoBuy** and **Indiezone** using their unique break-through e-commerce micro formula, and compilation **Ad-Engine** processing are proprietary methods, techniques and processes designed to derive independent economic value in both whole and fractional transactions in this segment of the Internet e-commerce market using methods not generally known to, and not being readily ascertainable by proper means, by other persons who could obtain economic value from its disclosure or use.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

20. This Court has federal question jurisdiction in this case under 28 U.S.C. 1331, as Plaintiffs have asserted claims arising under the laws of the United States. Specifically, causes of action involving federal questions related to overt and/or predicate criminal acts and continuing illegal acts alleged hereafter which cluster around the willful criminal activities of the individual defendants **Rooke** and **Rogness** involving both state and federal criminal acts and direct acts of racketeering activity including, but not limited to, Copyright infringement 17 U.S.C. 501-506(a)(1)(A); 18 U.S.C. 1030(a)(2)(C),(a)(4)(a)(5)(C):, of the Federal Computer Fraud and Abuse Act; Federal Trademark Act of 1946, as amended (the Lanham Act), 15 U.S.C. 1125(a) and 1125(d); 18 U.S.C. 1341 mail fraud and 1343 wire fraud; 18 U.S.C. 1832 (theft of trade secrets), 18 U.S.C. 1956 and 1957 money laundering, engaging in monetary transactions in property derived from specified unlawful activity; in violation of the RICO Statute 18 U.S.C. 1961-1968, et seq; 18 U.S.C. 2314-2315 possession and receipt of stolen property; and 18 U.S.C. 2319, criminal infringement of a copyright; in violation of the Stored Communications Act, 18 U.S.C. 2701- 11.

21. In the alternative this Court has jurisdiction over the subject matter of this complaint pursuant to 28 USC §1332, for the reason that there is complete diversity of citizenship between the parties and the amount in controversy, as to each defendant, exceeds $75,000.00, exclusive of interest and costs.

22. Venue is appropriate in the Northern District of California pursuant to 28 U.S.C. 1391, because a substantial part of the events giving rise to the dispute occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and the

- 6 -

Complaint

Court has personal jurisdiction over each of the parties as alleged throughout this Complaint for activities which have caused injury to the Plaintiffs here in California. Because the agreements establish this as the venue and it is where the company head-quarters are based.

23.  Because Plaintiffs have asserted various claims arising under state law that form part of the same case or controversy as the claims arising under federal law, this Court also has supplemental jurisdiction pursuant to 28 U.S.C. 1367 for violations of Cal. Penal Code 496 receipt of stolen property; Cal. Penal Code 502 unauthorized access to computers; theft of trade secrets Cal. Civ. Code 3426.11.

24.  Defendants' conduct also constitutes common law fraud, conspiracy, conversion computer trespass theft, larceny, aiding and abetting, breach of contract, and unjust enrichment.

25.  Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rule 3-2(d) because a substantial part of the events that give rise to the Commission's claims occurred in Marin County, California, where Plaintiff Indiezone is headquartered.

### THE PARTIES

**Plaintiffs-Jingit Enterprise Victims:**

26.  **eoBuy Ventures Limited** is a privately held  foreign corporation, owned by approximately 30 shareholders and having its place of business in the Republic of Ireland and is an entity member-victim of the *association-in-fact Enterprise(s)*.

27.  **Indiezone Inc.,** is a privately held Delaware corporation, owned by its majority shareholders having its place of business at 33 Prospect Avenue, Sausalito, California and is an entity member-victim of the *association-in-fact Enterprise.*

**RICO Person Defendants 18 U.S.C/ 1961:**

28.  *RICO Defendant,* **Todd Rooke** whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, is a *RICO Person,* within the meaning of RICO, 18 U.S.C. §1961(3) acting as principles within the meaning of 18 U.S.C. §2, distinct from the *Jingit Enterprise Entities* in charge of the day-to-day affairs-operations of the *Jingit Enterprise Entities* activity alleged herein and is the co-

- 7 -

founder/member owner and/or Co-CEO-employee of the *Jingit Enterprise Entities*, Jingit LLC, Jingit Holdings, Jingit Financial, and Music. Me.

29.   *RICO Defendant*, Todd Rooke directs the affairs-operations of the *Jingit Enterprise* in the illegal and incremental deployment-use of Plaintiffs' IP with the use of the fraudulently obtained investment funds paid into **Jingit Holdings** for payment of the day-to-day and continuing lawful and illegal activities of the of the *Jingit Enterprise Entities*.

30.   *RICO Defendant*, Joe Rogness whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, is a *RICO Person*, within the meaning of RICO, 18 U.S.C. §1961(3) acting as principles within the meaning of 18 U.S.C. §2, distinct from the *Jingit Enterprise Entities* in charge of the day-to-day affairs-operations of the *Jingit Enterprise Entities* activity alleged herein and is the co-founder/member owner and/or Co-CEO-employee of the *Jingit Enterprise Entities*, Jingit LLC, Jingit Holdings, Jingit Financial, and Music. Me.

31.   *RICO Defendant*, Joe Rogness directs the affairs-operations of the *Jingit Enterprise* in the illegal and incremental deployment-use of Plaintiffs' IP with the use of the fraudulently obtained investment funds paid into **Jingit Holdings** for payment of the day-to-day and continuing lawful and illegal activities of the of the *Jingit Enterprise Entities*.

32.   *RICO Defendant*, Phil Hazel ("Hazel") whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, is a *RICO Person*, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. § 2,   a member and/or employee of **Jingit Holding** distinct from the *Jingit Enterprise Entities* in charge of the day-to-day operations of the *Jingit Enterprise* activity alleged herein and is knowingly and intentionally aiding and abetting the other *RICO Defendants* directing the *Jingit Enterprise Entity* employees in the lawful affairs of the *Jingit Enterprise* and use of Plaintiffs' illegally obtained infringed-misappropriated IP with fraudulently obtained investment funds paid into **Jingit Holdings**.

– 8 –

33.   *RICO Defendant*, **Sam Ashkar ("Ashkar")** whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, is a *RICO Person*, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. § 2, a member and/or employee of **Jingit Holding** distinct from the *Jingit Enterprise Entities* in charge of the day-to-day operations of the *Jingit Enterprise* activity alleged herein and is knowingly and intentionally aiding and abetting the other *RICO Defendants* directing the *Jingit Enterprise Entity* employees in the lawful affairs of the *Jingit Enterprise* and use of Plaintiffs' illegally obtained infringed-misappropriated **IP** with fraudulently obtained investment funds paid into **Jingit Holdings.**

34.   *RICO Defendant* **Holly Oliver ("Oliver")** *RICO Defendant*, **Phil Hazel ("Hazel")** whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, is a *RICO Person*, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. § 2, a member and/or employee of **Jingit Holding** distinct from the *Jingit Enterprise Entities* in charge of the day-to-day operations of the *Jingit Enterprise* activity alleged herein and is knowingly and intentionally aiding and abetting the other *RICO Defendants* directing the *Jingit Enterprise Entity* employees in the lawful affairs of the *Jingit Enterprise* and use of Plaintiffs' illegally obtained infringed-misappropriated **IP** with fraudulently obtained investment funds paid into **Jingit Holdings.**

35.   *RICO Defendant*, **US Bank** is a publicly held corporation, having its place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, and is a *RICO Person*, within the meaning of RICO, 18 U.S.C. §1961(3) acting as a principle within the meaning of 18 U.S.C. § 2, and is distinct from the *Jinigt Enterprise* where its employees are in charge of the day-to-day affairs-operations of the *Jinigt Enterprise* activities alleged herein; and in charge of directing or otherwise participating in the illegal affairs of the *Jingit Enterprise* in the misappropriation-infringement and illegal use of Plaintiffs' **IP** which is being accomplished with fraudulently obtained investments funds paid into **Jingit Holdings** and then used for payment of servicing the day-to-day and continuing activities of the *Jingit Enterprise.*

– 9 –

**Defendants In Negligence-Aiding/Abetting or Accessory:**

36.    **Jingit Holdings LLC.,** (**"Jingit Holdings"**) f/k/a 7 Ventures LLC whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, was and is a privately held Delaware corporation, owned by its members **Rooke** and **Rogness** who are *RICO Persons*, within the meaning of RICO, 18 U.S.C. §1961(3) and who, together with other *RICO Persons* are using **Jingit Holdings**, as vehicle distinct from its corporate identity where the *RICO Defendants* are in charge of the day-to-day affairs-operations of the **Jingit Holdings**, and in charge of directing the illegal use of **Jingit Holdings**, in the formation of the *Jingit Enterprise.*

37.    **Jingit LLC.,** (**"Jingit LLC"**) whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, was and is a privately held Delaware corporation, owned by its members **Rooke** and **Rogness** who are *RICO Persons*, within the meaning of RICO, 18 U.S.C. §1961(3) and who, together with other *RICO Persons* are using **Jingit LLC.,** as vehicle distinct from its corporate identity where the *RICO Defendants* are in charge of the day-to-day affairs-operations of the **Jingit LLC.,** and in charge of directing the illegal use of **Jingit LLC.,** in the formation of the *Jingit Enterprise.*

38.    **Jingit Financial Services LLC.,** (**"Jingit Financial"**) whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, was and is a privately held Delaware corporation, owned by its members **Rooke** and **Rogness** who are *RICO Persons*, within the meaning of RICO, 18 U.S.C. §1961(3) and who, together with other *RICO Persons* are using **Jingit Financial.,** as vehicle distinct from its corporate identity where the *RICO Defendants* are in charge of the day-to-day affairs-operations of the **Jingit Financial** and in charge of directing the illegal use of **Jingit Financial** in the formation of the *Jingit Enterprise.*

39.    **Music.Me LLC.,** (**"Music.Me"**) whose primary/current place of business is 770 France Avenue South, Edina, Minnesota 55435, was and is a privately held Delaware corporation, owned by its members **Rooke** and **Rogness** who are *RICO*

- 10 -

*Persons*, within the meaning of RICO. 18 U.S.C. §1961(3) and who, together with other *RICO Persons* are using **Music.Me** as vehicle distinct from its corporate identity where the *RICO Defendants* are in charge of the day-to-day affairs-operations of the **Music.Me** and in charge of directing the illegal use of **Music.Me** in the formation of the *Jingit Enterprise.*

40.    **Tony Abena ("Abena")** is, upon information and belief, an officer/director, member or employee of **Jingit LLC.,** having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and  was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted, or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

41.    **John F. Fleming ("Fleming")** is, upon information and belief, an officer/director, member or employee of **Jingit LLC.,** having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and  was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

42.    **Dan Frawley ("Frawley")** is, upon information and belief, an officer/director, member or employee of Jingit LLC., having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and  was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by

– 11 –

Complaint

authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

43.    **Dave Moorehouse II ("Morehouse")** is, upon information and belief, an officer/director, member or employee of Jingit LLC., having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

44.    **Chris Ohlsen ("Ohlsen")** is, upon information and belief, an officer/director, member or employee of Jingit LLC., with a place of business having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

45.    **Justin James ("James")** is, upon information and belief, an officer/director, member or employee of Jingit LLC., having a place of business at 80 Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and was, or should have been aware of the fraudulent conduct-acts of the *RICO Defendants* in their illegal activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion of Plaintiffs' Property by authorizing transactions involving the illegal activities of the *Jingit Enterprise* resulting in injury and damages to Plaintiffs' business-property.

46.    **Shannon Davis ("Davis")** is, upon information and belief, an officer/director, member or employee of Jingit LLC., having a place of business at 80

1  Nicollet Mall, Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and was, or

2  should have been aware of the fraudulent conduct-acts of the **RICO Defendants** in their

3  illegal activities, in the control and use of **Jingit Holdings** and who was negligent or

4  otherwise aided/abetted or was an accessory after the fact in allowing the theft-conversion

5  of Plaintiffs' Property by authorizing transactions involving the illegal activities of the

6  **Jingit Enterprise** resulting in injury and damages to Plaintiffs' business-property.

7      47.    **Chris Karls ("Karls")** is, upon information and belief, an officer/director,

8  member or employee of Jingit LLC., having a place of business at 80 Nicollet Mall,

9  Minneapolis, Minnesota 55402, who owed a duty to Plaintiffs and was, or should have

10  been aware of the fraudulent conduct-acts of the **RICO Defendants** in their illegal

11  activities, in the control and use of **Jingit Holdings** and who was negligent or otherwise

12  aided/abetted or was an accessory after the fact in allowing the theft-conversion of

13  Plaintiffs' Property by authorizing transactions involving the illegal activities of the

14  **Jingit Enterprise** resulting in injury and damages to Plaintiffs' business-property.

15  **Defendants in Negligence Secondary-Vicarious Infringement:**

16      48.    **Walmart** is a publically held US corporation, owned by its shareholders and

17  having its place of business at 702 SW 8th-Street Bentonville, Arkansas 72716-8611 who is a

18  nominal Defendant unknowingly infringing in the use of Plaintiffs' IP.

19      49.    **General Electric** is a publically held Delaware corporation, owned by its

20  shareholders and having its place of business at 3135 Easton Turnpike Fairfield, Connecticut

21  06828 who is a nominal Defendant unknowingly infringing in the use of Plaintiffs' **IP**.

22      50.    **Target** is a publically held Delaware corporation, owned by its shareholders

23  and having its place of business at 3135 Easton Turnpike Fairfield, Connecticut 06828 who is

24  a nominal Defendant unknowingly infringing in the use of Plaintiffs' **IP**.

25      51.    Plaintiff does not currently know the true names of defendant DOE(s) and

26  ROE(s) 1 through 10. However, Plaintiff will seek leave of the court to amend this Complaint

27  by alleging the true names and capacities of defendants, Does 1 through 10 when they are

28  ascertained.

Complaint

**The Association-in-Fact *RICO Enterprise*:**

52.     **Jingit Holdings Jingit Financial, Jingit LLC., and Music.Me, Rooke, Rogness, Hazel, Ashkar, and Oliver,** together with **Abena, Fleming, Frawley, Moorehouse, Ohlsen, James, Davis, Karls, Wal-Mart, General Electric, Target, DOE(s) and ROE(s),** are at times collectively and/or in varying combinations-groupings the ***Jingit Enterprise*** which existing ***as an association-in-fact*** controlled by the ***RICO Person Defendants* Rooke, Rogness, Hazel, Ashkar, Oliver** and **US Bank.**

53.     The ***Enterprise*** exists through a purposeful, continuing interrelated and ongoing a pattern of racketeering activities interplayed between the normal operations of these companies and the affairs of the criminal activities in the ***Person*** Defendants who are distinct from **Jingit Enterprise Entities** and whose criminal activities effect interstate and international commerce as these terms apply under **18 U.S.C. §§ 1951 and 1962(a)-(d).**

## COMMON CLAIMS

54.     The theft of Plaintiffs' **IP** and obstruction in Plaintiffs' right to commercial entry to the e-commerce markets was the common target of ***RICO Defendants*** where: 1) the theft was accomplished and involved multiple predicate acts of racketeering activity in the form of mail fraud by an overnight carrier, and wire fraud, via the Internet or over the telephone using false and otherwise misleading statements to Plaintiffs used to: 1) induce Plaintiffs to release ***RICO Defendants*** **Rooke** and **Rogness** from their non-competition Agreements; 2) or third parties who sought out to license Plaintiffs' **IP**; 3) in obtaining the funding for the ***Jingit Enterprise Entities*** so as to illegally deploy Plaintiffs' **IP** as their own; 4) where in each instance the ***RICO Defendants*** knowingly and intentionally used these false or otherwise misleading oral and written statements and/or material omission as set forth herein intending to cause Plaintiffs and other third-parties to rely on the statements-solicitations; and 4) causing injury to Plaintiffs' businesses and **Property.**

- 14 -

**Distinctiveness-purpose-relationship and longevity:**

55.     Notwithstanding that the *Jingit Enterprise* is an *association-in-fact enterprise* each of the individuals or corporate entities are **RICO Persons** within the meaning of RICO, 18 U.S.C. §1961(3) acting as principles within the meaning of 18 U.S.C. §2 in committing the acts of racketeering and are separate and district from the **RICO Defendants.**

56.     Each of the *Jingit Enterprise* Corporate *Entities* exists as private companies and operates as legitimate business entities performing corporate functions and otherwise engaging in other lawful activity outside or otherwise independent from the RICO actvities.

57.     Contrary to their fiduciary duties in the performance of the lawful activities of the *Jingit Enterprise Entities*, and under the cover of their existence the **RICO Defendants** have conspired and are using one or several of the *Jingit Enterprise Entities* and **US Bank** for the purpose of performing the illegal Schemes hereafter outlined; and although the **RICO Defendants** often appear to be interacting or performing in their lawful capacities with the individual *Jingit Enterprise Entities* for the most part, they are acting in furtherance of the collective **RICO Defendants** Schemes for the benefit of the **RICO Defendants** alone, and so as to injure Plaintiffs in their business or **Property.**

58.     The lawful activities are undertaken while the **RICO Defendants** simultaneously orchestrate the illegal acts of racketeering activity including mail and wire fraud-money laundering and providing the means opportunity for obtaining-receiving the stolen **Property**; and funding for the *Jingit Enterprise* Scheme.

59.     The Scheme is singular in purpose involving multiple exploits with a targeted victim, and has been carried out on multiple occasions through the continuing relationships forged among the **"Person" RICO Defendants** and includes the ongoing criminal activity which exists to this date.

Complaint

60. *RICO Defendants*, **Rooke** and **Rogness** arc the hub of the *Jingit Enterprise* corporate activities where, from their positions as Co-CEO's of these *Jingit Entities* in the operations of the *Jingit Enterprise* they direct the illegal affairs of the *Jingit Enterprise* in coordination with the remaining *RICO Defendants*, who have been strategically placed by them in the *Jingit Enterprise Entities* as employees, members directors/officers.

61. In the performance and execution of the Scheme, in an overt act designed to maintain the affairs of the *Jingit Enterprise*, *RICO Defendants* **Rooke** and **Rogness** as Co-CEO's of **Jingit Holdings** the **"funding arm"** of *Jingit Enterprise*, have ensured that **Hazel** and **Ashkar** each assumed either a position of employment or individual positions as officers and/or directors on at least one of the Boards of the *Jingit Enterprises Entities* and in particular the Boards of **Jingit Holdings Jingit Financial**, **Jingit LLC.**, and **Music.Me**.

62. From their positions as members, insiders, employees, officers and/or directors the *RICO Defendants* **Rooke** and **Rogness**, by their control direct the remaining *Defendants* in the day-to-day operation of the *Jingit Entities.*

63. The Schemes and control are accomplished in performance of the racketeering activity by means of electronically-telephonically circulating false and misleading statements to the **Jingit Boards** and its employees concerning the misappropriation of the **IP**.

64. Often the use of the Plaintiffs' **IP** is disguised as a patent found in the public domain or as falsely claimed, created by in house engineering-research and development.

65. In each instance, the *RICO Defendants* knew and were aware the statements and content of the documents were false misleading and otherwise omitted material information to make the statements and/ or reports truthful and that the *Jingit Boards* would rely on them in support of the companies lawful operations.

66. Each statement and document was material to the manner in which the *RICO Defendants* obtained and controlled the affairs of the Jingit Enterprise.

67. Since at least July 2010, the *RICO Defendants* have by agreement, on multiple occasions, intentionally and knowingly formed committed, assisted or otherwise

- 16 -

1  ratified the Schemes of mail and wire fraud intending to injure Plaintiffs' business directly
2  and indirectly using-controlling the *Jingit Enterprise Entities* where they have
3  fraudulently claimed right of ownership to Plaintiffs' **IP** and fraudulently obtained funds
4  for operations of the *Jingit Enterprise Entities* in a manner involving a pattern of
5  racketeering activity.

6      68.   At the direction of **Rooke** and **Rogness**, the rest of the *RICO Defendants*
7  operate the *Jingit Enterprise* for the purpose of concealing the fraud by means of a
8  conspiracy engaging related Schemes which continue to the present, where each
9  *RICO Defendant* has, or knows they will, directly or indirectly commit violations of
10  the law in the continuing infringement and misappropriation of Plaintiffs' **IP**.

11      69.   By means of the conspiracy the *RICO Defendants* illegal acts have
12  caused and are causing injury to the business and Property of the Plaintiffs.

13  **Relatedness and Continuity:**

14      70.   Despite the relationship between the *Rico* **Person** *Defendants* and the
15  *Jingit Enterprise* entities, the *RICO Defendants* are distinct from the *Jingit*
16  *Enterprise* where their acts were committed on multiple occasions in violation of
17  USC §§1961-1968; by using the corporate façade and legitimate operations of the
18  *Jingit Enterprise:* 1) with the same *purpose* and results depriving the Plaintiff
19  Corporations of business opportunities and profits by the illegal use-conversion of
20  their *IP* in violation of 18 U.S.C. §§ 1030; 18USC §§ 1956-1957; U.S.C. 18USC
21  §§2314-2315 and 2319; 2) with the same *victims* and in *related* methods of
22  commission where the Schemes to defraud have the *common* types of predicate acts,
23  false and misleading statements through the use of the mails and electronic
24  transmissions involving interstate transmission of statements-documents in violation
25  of 18U.S.C. §§1951 and 18U.S.C.§§1341-1343; and have been committed by the
26  *RICO Defendants* through the *Jingit Enterprise,* by continuous, uninterrupted,
27  criminal activity, which began at the very least 2 years prior to November 2011, and
28  continues to the present.

- 17 -

__Continuing Scheme- Pattern-Predicate Acts-Multiple Victims:__

71.     After the theft of Plaintiffs' **IP**, in performance of the acts constituting the **RICO** violations alleged hereinafter, the **RICO Defendants** have for at least two years by agreement and conduct formed an ***association-in-fact enterprise***, *"Jingit Enterprise";* for the purpose of a series of similar interrelated Schemes designed to provide a vehicle for the continuous and systematic deployment of the Plaintiffs' **IP**.

72.     The Schemes are global in effect and at times constitute separate patterns of racketeering activity involving multiple acts, and from time-to-time all or some of the **RICO Defendants,** where the **RICO Defendants** through a pattern of racketeering activity including mailing and telephonic-electronic communications, as claimed hereafter, have maintained control of the day-to-day affairs and operations of the ***Jingit Enterprise Entities*** and have illegally used-invested funds obtained through a pattern of racketeering activity both directly and indirectly passing the funds through the ***Jingit-Enterprise Entities*** so as to maintain control of them creating the disruption-interference in the Plaintiffs' ability to enter the e-commence commercial markets in the continuing cycle of fraud, thus making **eoBuy** and **Indiezone** victims of the ***Jingit Enterprise*** leaving them without the ability to access their **IP** or raise funds or issue license to their potential licensees.

73.     Plaintiffs and its cliental- potential third-party licensees were defrauded by one or more of these mail and wire dispatches.

74.     This pattern of mails and interstate wire-communications occurred over a period for in excess of two years from the date the **RICO Defendants** Schemes were first put into effect, all in furtherance of the fraud which has caused injury to Plaintiffs business and property.

75.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

76.     Thus, Plaintiffs assert claims against all **RICO Defendants** for violating or conspiring to violate 18 U.S. C. §§ 1962 (a),(b) and (c), in whole or in part, as defined under the specific sections of the Statute which prohibits any person; 1) from the use of,

- 18 -

Complaint

or making any income investments, of racketeering funds in the operation of the enterprise engaged in interstate commerce;   2) from acquiring and/or controlling the enterprise through a pattern of racketeering activity engaged in interstate commerce; 3) who is associated with or employed by an enterprise from conducting or participating in the conduct or affairs of the enterprise through a pattern of racketeering activity engaged in interstate commerce.

## PLAINTIFFS' IP CONTENT, AUTHORSHIP, AND EXCLUSIVE RIGHT OF OWNERSHIP

77.   During its **IP** development period **coBuy** engaged in-house programming teams employing dozens of developers where programmers spent thousands of man hours in the development of the software to implement and deploy the **coBuy** system.

78.   In July 2002, Credit Suisse invited **eoBuy** to demonstrate its system to high-level banking executives in Zurich, Switzerland.   After demonstration of the **eoBuy** processes Credit Suisse engaged an independent full review of the product processes, based on its unique methods; and on December 30, 2002, the system and the business model were fully endorsed by Credit Suisse as a viable solution for fractional digital e-commerce sales.

79.   Thereafter, beta deployment of the system led to an invitation by Hewlett Packard (HP) to develop a strategic partnership for the **eoBuy** financial processing systems and the introduction of the concept of an on line music store-**Indiezone** as the first merchant portal, go-to-market Proof of Concept for the **eoBuy IP**, financial process- methods.

80.   In 2005, **eoBuy** entered into an exclusive negotiation agreement with HP. The exclusivity period was in place from January 31, 2005, and continued until October 30, 2006. Under the terms of the Agreement, HP offered to pay, **coBuy** a monthly fee of $83,000.00.

81.   Two principal studies were carried out during the exclusivity period, a Technical Assessment and an Independent Business Valuation ("Net Present Value Business Analysis") ("Value Analysis") was conducted by an outside and independent company SMARTOrg.

- 19 -

Complaint

82.    HP commissioned the study in order to attribute a valuation to the product and the **IP**, for the purpose of a prospective investment by HP into **eoBuy**. **The HP** commissioned SMARTOrg valuation put the pre-launch valuation of **eoBuy's** proprietary methods-processing system at $1,300,000,000.00. ($1.3 Billion U.S. Dollars) pre-launch and at $20,000,000,000 ($20 Billion U.S. Dollars) post launch.

83.    The Valuation was based on the potential revenue for generating income based on the 2005 e-commerce statistics and metrics assuming the employment of the unique **eoBuy** processes and methodology in the e-commerce merchant-to-merchant and consumer driven micro digital sales and purchases over the Internet.

84.    In or about January 2005, Connor Fennelly, CEO of eoBuy was introduced to Defendant **Rooke**. At the time **Rooke** was a Director at HP working in the Office of Operations, Strategy and Technology.

85.    From his position as director of strategic business development at HP, **Rooke** was privy to the unique **eoBuy** e-commerce micro-billing and payment processing system and the joint development-deployment strategy of using **Indiezone** as the online store Proof of Concept.

86.    During this period Defendant **Rooke** was acting as liaison in the assessment and valuation efforts on behalf of HP and **eoBuy** in the SmartOrg valuation analysis.

87.    Defendant **Rooke** was aware of the merits of the system as well as its commercial potential and the value of the project based on the SmartOrg Value Analysis presented to HP by virtue of his participation in the project.

88.    After the SmartOrg Value Analysis was delivered in or about October 2006, **eoBuy** and HP entered into negotiations to form a definitive business alliance for the joint development and deployment of the **eoBuy** payment system using the **Indiezone** platform for digital music content as the online distribution platform for as the initial Proof of Concept.

89.    Shortly thereafter HP shifted its internal management and underwent policy changes, wherein negotiations failed to produce an agreement to move forward. **eoBuy** and

- 20 -

HP agreed to a release from any further contractual obligations to one another where **eoBuy** was granted the exclusive right-assignment between **eoBuy** and HP for any and all joint **IP** and reports developed during their relationship.

90.     Thereafter **eoBuy** proceeded in the development of the **eoBuy** processes and strategies under a development division/arm of the Company-**Indiezone**.

## FORMATION OF THE PLAN BY DEFENDANTS ROOK AND ROGNESS TO OBTAIN EMPLOYMENT AND OWNERSHIP OF EOBUY

91.     Plaintiffs claim the IP theft involves a pattern of organized criminal activity comprising interrelated schemes which began in September 2008, after **Rooke** and **Rogness** executed contracts as work-for-hire employees.

92.     The plan which began with the realization by Defendants **Rooke** and **Rogness** that they would be limited in their opportunity to obtain equal ownership of Plaintiff **Indiezone,** and unable to compete with **eoBuy** and **Indiezone** in real-time micro digital sales and consumer engagement over the Internet.

93.     The core defining character of the Indiezone, Ad-Engine, namely direct and real-time compensation for ad-engagement, consumer ad-targeting and business model were developed   and applied through the **Indiezone's AdEngine** proprietary processes-methods at a time that Rooke and Rogness were work for hire employees.

94.     At all times material hereto, although not formalized in 2008, in addition to his employment with HP, **Rooke** had a prior existing relationship with the Defendant **Rogness** and Defendant **Two Fish LLC.**

95.     At all times material hereto, **Rogness**, while using the entity **Two Fish** a/k/a 7 Ventures LLC,  k/n/a **Jingit Holding LLC.**, had been in the business of selling **Rogness'** own works over the Internet.

96.     At all times material hereto, **Rogness**, like most others involved in music sales over the Internet, was frustrated with the lack of sales brought about by the monetary threshold barriers in Internet transactions for sales.

97.     One of the core problems encountered and systemic to Internet transactions was the inability of a merchant to sell content with a perceived value of less than .99 cents.

98.     At all times material hereto, by reason of his relationship with **Rooke**, **Rogness** also became aware of the HP SmartOrg-pre launch valuation of the **eoBuy** proprietary system of $1,300,000,000.00-U.S., Dollars.

99.     At all times material hereto, Defendant **Rooke** entered into an agreement with Defendant **Rogness** having the plan and goal of becoming equal partners in their ownership interest of the **eoBuy IP.** It was agreed among them that each would seek employment with **eoBuy**.

## DEFENDANTS ROOKE AND ROGNESS AGREEMENT
## TO SEEK EMPLOYMENT AND TO OBTAIN OWNERSHIP OF EOBUY

100.    In or about March 2006, **Rooke** left HP as director of strategic business development to seek employment with **eoBuy**.

101.    Prior to leaving HP, fully knowing the potential value of the **eoBuy** payment processing **IP** and the **Indiezone** concept, **Rooke**, contacted Fennelly and sought employment with **eoBuy** claiming his "special" understanding of the **IP** and his ability to move the **IP** to market through his HP and other industry contacts.

102.    **Rooke** told Fennelly he would do so for a deferred salary and an eventual ownership share in **eoBuy**.

103.    Fennelly advised **Rooke** the he would not be able to offer him equity in **eoBuy** initially but would hire him under an executive employment agreement with a partially deferred salary after a trial period of employment with **eoBuy**.

104.    In or about March 2006, **Rooke**, agreed to accept employment with **eoBuy** and was engaged by **eoBuy** as a work-for-hire employee assuming the position of Chief Strategy Officer and Chief Technical Officer of **eoBuy**.

105.    In or about April-May 2006, at his request, **Rooke** was assigned to work on the Companies' **IP** strategies surrounding the development of the proprietary business model involving **eoBuy's** e-commerce micro processing methodology and its business

- 22 -

strategy development-deployment of an **Indiezone** sale and purchase portal for digital music and other content.

106.   In or about August 2006, at all times material hereto, not long after **Rooke** was hired, **Rooke** advised Fennelly that he had a candidate to assist in the joint development and deployment of the Plaintiff Corporations' marketing launch strategy for the **Indiezone**.

107.   In or about August 2006, **Rooke** introduced **Rogness** to Fennelly wherein negotiations commenced concerning their future employment.

108.   At all times material hereto, **Rogness**, advised Fennelly that he had been an independent musician and was familiar with the sale of music related to the Internet online store concept and understood the barriers of entry to the e-commerce markets for sale and purchases to include fractional sales and purchases below $.99.

109.   In or about December 2006, **eoBuy's** Board of Directors' determined that it wanted to develop subsidiary entities to license **eoBuy** technologies in an industry segment or vertical deployment strategy.

110.   **EoBuy's** Board determined that the first license would be issued in a joint venture with it in the development of the music portal proof of concept for the sales and purchases in fractional amounts for digital music content with a new entity to be named **Indiezone.**

111.   Shareholder interest amounting to 75% ownership of the **Indiezone** founder's stock was to be distributed to the shareholders of **eoBuy** and **eoBuy** itself.

112.   Defendants **Rooke** and **Rogness** were advised of the **eoBuy** Board's decision to license the **eoBuy** technology in a subsidiary wherein **Rooke** and **Rogness** seeing an opportunity to gain ownership of the **IP** as it was developing advised Fennelly that they wanted to help develop the **Indiezone** business model but would require employment with a deferred salary and a shareholders stake of 40% of the founder's stock in **Indiezone**.

113.   Fennelly advised **Rooke** and **Rogness** of the equity split allotted by **eoBuy's** Board and that he would be unable to meet the founder's stock requested and offered the remaining 20% of the total founder's stock ownership under an employee vesting package

- 23 -

to be divided among **Rooke** and **Rogness** stating to them that any change beyond 20% would dilute the ownership interest of **eoBuy** equity holders, and further advised Defendants that the **Indiezone** offer included vesting was firm; that unless the shareholder interest and other terms-conditions of employment were accepted and agreed to in writing the employment offer with **Indiezone** would be withdrawn.

114. In or about March 2007, **eoBuy** in preparation for the development of the **Indiezone** music portal, created a new formal corporate structure forming **Indiezone, LLC**, a limited liability company created as a Delaware Corporation.

115. In or about April 2007, Defendants **Rooke** and **Rogness** requested that Fennelly split the remaining **Indiezone** founder's stock under the vesting program equally among them, wherein if he did so **Rooke** and **Rogness** would each agreed to abide by the terms of any written agreements specifically the terms of their shareholder interest in **Indiezone**; the terms of secrecy in the development and deployment of Plaintiffs' joint **IP-Property**; as well as an assignment of past ideas, and those developed during their employment together with an express acknowledgement of authorship; their agreement not to compete, and to abide by their fiduciary duties of loyalty to Plaintiff Corporations.

116. In or about May 2007, **Rooke and Rogness** executed copies of the Plaintiff Corporations' Employee Invention Assignment and Confidentiality Agreements, their Confirmatory Assignment Agreements and Employee and Stock Purchase Agreements [from time-to-time collectively the "Agreements"], wherein each purchased 5% of the **Indiezone** founder's stock.

117. The Agreements provided **at-will** employment with absolute and unconditional loyalty of **Rooke** and **Rogness** as employees of **Indiezone** agreeing to the contractual terms of, and for, secrecy-non-disclosure-confidentiality, non-circumvention, non-competition, non-use, assignment and disclosure of all developed and to be developed **IP**; together with their assignment of all of Intellectual Property Rights and/or Moral Rights.

118. In May 2007, Defendants **Rooke** and **Rogness** agreed, and otherwise confirmed that neither had ever authored, co-authored, created or otherwise had any prior

Complaint

intellectual property rights or moral rights for assignment and affirmed the exclusive **Property** rights of the Plaintiff Corporations as to the authorship/ownership of any **IP** and/or Trade Secrets developed in any of the areas in the e-commerce industry during their employment with **Indiezone**, including micro-payments, payment platforms, content monetization, ad-engines, engagement business models, etc.

119.   All of the terms and conditions of the Agreements were in writing, and executed wherein it was agreed by the parties that the terms would survive the termination of the Defendants, **Rooke** and **Rogness.**

120.   At all times material hereto, **Rooke** and **Rogness** knew and were aware of the terms and conditions of their employment including the secrecy and non-compete clauses of the Agreements.

121.   At all times material hereto, **Rooke** and **Rogness** knew and were aware, that Plaintiffs would rely on the Agreements in providing them with access to their **IP-Property.**

## PLAINTIFFS' INTENT TO MAINTAIN THE SECRECY OF THEIR IP

122.   In or about May 2007, **eoBuy** granted a restricted license of its technology to Indiezone for the financial transaction component of its business.

123.   Said license created restrictions in the use of the unique **eoBuy** processes-methods and technology offered by **Indiezone**, wherein Defendants **Rooke** and **Rogness** knew and were aware of the **eoBuy** licensing and its restrictions and Plaintiffs intent to keep their **IP** secret.

124.   Commencing May 2007, Plaintiff Corporations required that all employee communications between the California and Minnesota Offices including communications with third-party customers and investor relations, and any inquiries were to be maintained as e-mail files on a host Server to be preserved for **Indiezone** so as to monitor the Plaintiff Corporations' business relations and communications.

125.   The system was instituted to protect the confidential information subject to the laws of California and existing Agreements executed by Defendants **Rooke** and **Rogness** and all other third parties.

- 25 -