126. At all relevant times and commencing in or about May 2007, and continuing until December 29, 2009, the Server was maintained for the purpose of storing e-mail, processing and storing the developing collective **IP** of the Plaintiff Corporations including, but not limited to, the fixed command Codes embedded in the **IP** manuscripts together with the joint methods, techniques and processes of the joint **eoBuy** and **Indiezone** micro billing and processing systems music portal.

127. At all relevant times the Server was located in the Minnesota offices of **Indiezone** and was used by **Rooke** and **Rogness** for interstate commerce and e-mail communications by the Plaintiff Corporations between its third-party vendors, investors and between Defendants **Rogness** and **Rooke** and the California offices of Plaintiff Corporations.

128. At all relevant times commencing in or about May 2007, Defendants **Rogness** and **Rooke** were authorized to access the Server for the limited purpose of furthering the development of the Plaintiffs' **IP**.

129. Commencing May 2007, Plaintiffs maintained both a written copy of their developing **IP** and developing Trade Secrets Manuals as well as a copy of said IP and Trade Secret Manuals in electronic format which was password protected stored or otherwise deposited-maintained on the Server.

130. At all relevant times material hereto, so as to monitor and limit the access and maintain the Server Plaintiff Corporations instituted a policy and/or protocol of safeguarding their **IP** and Trade Secrets by requiring employees to develop unique usernames and passwords when accessing the Server and otherwise storing or retrieving the Companies' **IP** and Trade Secret information.

131. Commencing May 2007, the employee users of said Server were, on demand, required to provide a written copy of their user name and access password and otherwise agreed to provide a departure debriefing at the end of their employment with the Companies so as to allow new employees to immediately access the Server change usernames and passwords as well as retrieve Plaintiffs' **IP** and/or Trade Secrets.

132. From time-to-time, by reason of the ongoing development of the deployment strategies for the **IP** and Trade Secrets changes were updated on the Server.

Complaint

133.   Commencing May 2007, the electronic username and password protected IP and electronic copies of the Plaintiffs' Trade Secret Manuals were maintained on the Server in Minnesota.

134.   Commencing May 2007, IP and Trade Secret information was internally shared and otherwise exchanged among Plaintiff Corporations via a secured e-mail network where unique e-mail addresses- identifiers were created and maintained on the Server.

135.   Commencing May 2007, Defendants **Rooke** and **Rogness** created e-mail addresses using the unique identifiers todd@indiezone.com and joe@Indiezone and relevant alias.

136.   At all times material hereto, defendants were aware of the purpose of the unique usernames and passwords and agreed to disclose said passwords upon demand by **eoBuy** and **Indiezone.**

137.   Said user names and passwords were unique to and known only by **Rooke** and **Rogness** wherein said user names and passwords were used to maintain secrecy-monitor access to the protected materials housed on the host server and used to support the development of the **IP** and Trade Secret applications.

138.   Commencing May 2007, whenever Defendants **Rooke** and **Rogness** wanted to gain access to the Server they entered their unique access usernames and passwords to the security systems for the Server so as to deposit and otherwise access Plaintiffs' **IP** and Trade Secret Manuals in the performance of their daily duties as work for hire employees of **Indiezone.**

139.   Commencing in or about 2007 and continuing until October 2009, Defendants **Rooke** and **Rogness** worked from the **Indiezone** office located in Eden Prairie Minnesota and would from time-to-time visit the **Indiezone** offices located in California.

140.   Over the course of the next 18 months extensive technological and strategic advancement was achieved including the development of **Indiezone Ad-Engine** a unique process not generally known by the public whereby a next generation music distribution

Complaint

1   platform **(Indiezone Ad-Engine)** was created which included a platform to enable
2   consumers to engage with advertisers and earn money using the **Ad-Engine** to make
3   purchases online or offline in the real world in micro-fractional sales and purchases.

4       141.   The **Indiezone Ad-Engine** was designed and included a license tailored-
5   made and adapted to implementation of the **eoBuy** payment platform, wherein: 1) beginning
6   on or about July 27, 2007 Cynergy Systems, a US based software development company
7   was presented with a Request for Quote of **Indiezone's Ad-Engine in UML (Unified**
8   **Markup Language)**; 2) that on August 19, 2007, **Indiezone** submitted its UML documents
9   for software development executing a Statement of Work (SOW) with Cynergy Systems
10  resulting in the creation by Cynergy Systems of a software implementation of the **Indiezone**
11  music platform, the **Indiezone Ad-Engine** as well as a custom **eoBuy** implementation of
12  the payment technology required to underpin the transaction and accounting services of the
13  platform, together with the combined unique trade secret processes of **eoBuy** and **Indiezone**
14  **IP.**

15      142.   The joint **eoBuy-Indiezone** systems were prepared for launch in beta mode;
16  wherein on February 22, 2008, as directed by Fennelly for the purpose of raising investors'
17  capital for **Indiezone's** entry into the e-commerce market and deployment of the joint
18  processes, **Rogness** created a promotional video presenting the unique features and joint
19  processes of the **eoBuy** and **Indiezone** process.

20      143.   On or about June 2, 2009, the Plaintiff Corporations adopted the service mark
21  **Music.Me**, capturing the domain name and otherwise establishing Plaintiff Corporations'
22  exclusive right to ownership and use to the name chosen and assigned to their strategic joint
23  deployment of the **Indiezone Ad-Engine.**

24               **DEFENDANTS ROOKE AND ROGNESS SCHEME TO**
       **EXTORT A LARGER SHARE IN THE OWNERSHIP OF Indie Zone**
25

26      144.   Plaintiffs are informed and believe, based on e-mails and other documentation
27  dispatched by the Defendants **Rooke** and **Rogness** that each knew Plaintiffs' joint deployment of its **IP**
28  was soon to be released and wanted to renegotiate their contracts and equity positions with **Indiezone.**

- 28 -

145. Commencing on or September 8, 2008, **Rooke** and **Rogness** complained to Fennelly that they were dissatisfied with the terms of their employment and shareholder equity packages and demanded additional equity from **Indiezone** for the work they had done on the development of the Companies' **IP** and Trade Secrets.

146. On or about September 8, 2008, notwithstanding their knowledge that, as Fennelly had advised them during the negotiations for employment, they could not obtain a greater shareholder interest in **Indiezone, Rooke** and **Rogness** presented a new business organizational plan to Fennelly demanding a greater shareholder interest and/or ownership in **Indiezone**, wherein in a predicate act in violation of their contractual agreements designed to extort money/property from Plaintiffs, on or about September 8, 2008, Defendants **Rooke** and **Rogness**, who were in Minnesota dispatched and presented a written communication, via internet transmission, to the Plaintiff Corporations in California demanding a change to the capital structure of the **Indiezone** equity distribution plan which was designed to accomplish their goal.

147. Defendants **Rooke** and **Rogness**, were demanding the creation of multiple corporate entities that would act as holding companies for the **IP** developed by reason of their work-for-hire employment with **eoBuy** and/or **Indiezone** and otherwise demanding a change in the overall capital structure of the company with an equal split of the stock as it pertained to **Indiezone** which henceforth would be carved out as a separate business entity or as demanded, they would leave **Indiezone** and start a new company using what they claimed were their own "**ideas**".

148. At all times material hereto, Defendants **Rooke** and **Rogness** knew that their claim to leave **Indiezone** and start a new company using their own "**ideas**" was designed to extort a new organizational plan for money-property-equity and that by making such a demand they were in violation of their **at-will** employment Agreements with Plaintiff Corporation, and that their conduct was designed to fraudulently circumvent and dilute the ownership interest of the **eoBuy** shareholders in **Indiezone.**

149. On or about September 10, 2008, Fennelly, who was in California, called **Rooke** and **Rogness** who were in Minnesota on the telephone advising then that they were

-29-

in violation of their fiduciary duties, their written Agreements with **eoBuy** and **Indiezone** investors and refused to make changes in accordance with their demands; wherein Fennelly demanded that **Rooke** and **Rogness** reaffirm their Agreements with **Indiezone** or conduct a technology turnover meeting of the **IP** if they intended to  leave their employment with **Indiezone**; wherein Fennelly advised **Rooke** and **Rogness** that if a violation of their Agreements occurred he would seek injunctive relief as per the terms of their Agreements with **Indiezone** and all other lawful means necessary to safeguard the Companies' **IP**.

150.   At all times material hereto, **Rooke** and **Rogness** were angered by Fennelly's refusal to accept their corporate re-structuring demands and revised equity splits for the Plaintiff's **IP**; wherein shortly after their conversation with Fennelly and over the course of the next several days Defendants **Rooke** and **Rogness** agreed, conspired and planned among themselves to execute the theft- misappropriation-infringement of Plaintiffs' **IP** and began to commit certain overt and predicate acts willfully intending to sabotage and misappropriate Plaintiffs' **IP** and otherwise eliminate the Plaintiff Corporations entry into the digital e-commence Internet-mobile market for  sales and purchase for their own commercial benefit and in the injury to Plaintiffs' business and property.

151.   At all times material hereto, **Rooke** and **Rogness**, in furtherance of their plan, fully knowing they would not honor or abide by the terms of their written Agreements  with **Indiezone** and otherwise honor the licensing agreement **Indiezone** had with **eoBuy**, falsely advised Fennelly, during a return telephone conversation on or about November 11, 2008, from Minnesota to California that the Plaintiff Corporations could rely on their promises and falsely stated to Fennelly during said telephone conversation that they would each abide by the terms of their written Agreements.

152.   At all times material hereto, unbeknownst to Fennelly, although Defendants **Rooke** and **Rogness** had agreed to abide by the terms of their written Agreements specifically the terms of their shareholder ownership interest in **Indiezone**, the terms of secrecy in the development and deployment of Plaintiffs' **Property** as well as assignment of **ideas** and acknowledgement of authorship, each had agreed to move forward with the theft

- 30 -

1  of the Plaintiffs' **IP** and to sabotage the **Indiezone** Servers so as to delay or prevent the
2  launch of the **eoBuy-Indiezone** join technologies so that they could misappropriate the **IP**,
3  be first to the market and claim authorship and ownership of said **IP**.

4  153.  Thereafter, in contravention of the law, their written employment and
5  secrecy Agreements, as well as their fiduciary obligations and oral commitments
6  reaffirming their loyalty, defendants **Rooke** and **Rogness** in several overt and predicate
7  acts intending to execute their plan by running the affairs of **eoBuy** and **Indiezone**, from
8  **Indiezone's** Minnesota offices began to strategically and deliberately interfere with
9  **Indiezone's** deployment-development timeline by sending e-mails to California
10  intentionally misinforming Fennelly of the development progress-stages of the beta
11  testing and deployment schedules as well as by maintaining secret communications with
12  or otherwise withholding communications concerning inquires of potential investors and
13  outside vendors seeking licenses from **eoBuy** and **Indiezone**.

14  154.  Over the course of the next 12 months, in the performance of the scheme to
15  defraud-infringe-control, convert and otherwise misappropriate Plaintiffs' **IP**,
16  Defendants **Rooke and Rogness** committed multiple predicate acts in violation of 18
17  U.S.C. 1961-1968, et seq.

18  **INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS;**
19  **COPYRIGHT INFRINGEMENT; MISAPPROPRIATION NDA**
20  **Rooke and Rogness- Interference with Prospective Business-Wire-Mail Fraud:**

21  155.  That on July 7, 2009, Joseph R. Cellura, the CEO of Malibu Entertainment
22  Group (MEG) located in Las Gatos, California made a telephonic inquiry to **Rooke at**
23  **the Indiezone** Minnesota office asking to speak with Fennelly concerning his prior
24  request of MEG's desire to obtain a license for use of certain **eoBuy-Indiezone**
25  technology on behalf of MEG, and other proposed strategic partners of MEG including,
26  My ESPN, the United States Army, Malibu Entertainment Group, Disney Enterprises,
27  Avinci, China Wireless, Consortium Holding, Inc., Tarsin Inc., Walmart, Target,
28  General Electric and others.

Complaint

156.   In response thereto, in the performance of the theft of Plaintiffs' **IP**, in August 2009, over the telephone **Rooke** and **Rogness** from the **Indiezone** offices in Minnesota, fully knowing and intending on fulfilling their plans to illegally seize Plaintiffs' **IP**, and use it for their own economic advantage, in a follow-up telephone call directed to the inquiry made by Cellura, did contact Cellura over the telephone, in California, while intending to deceive him and so as to cause financial harm to Plaintiffs; intending to further the planned theft and so as to conceal the true ownership of Plaintiffs' **IP** did falsely advise Cellura that Fennelly was out of the country; did falsely advise Cellura that Fennelly was pursuing other ventures and that he was no longer in control of **eoBuy** or of **Indiezone**; did falsely advise Cellura that a new company **Two Fish**, as controlled by **Rooke** and **Rogness,** had obtained all of the rights and **IP**-work product from **eoBuy** and **Indiezone.**

157.   At all times material hereto, **Rooke** and **Rogness** knew the statements made to Cellura were false; were made intending to make Cellura rely on them, and were made to further their plans to cause economic harm to Plaintiffs in the licensing of the **IP** to Cellura.

158.   At all times material hereto, in performance of the IP theft,  during the period of July 2009 through October 2009, including but not limited to August 10, 2009, August 11, 2009, August 19, 2009, September 4, 2009 and **Rooke** and **Rogness** from the **Indiezone** offices in Minnesota and to Cellura at the MEG offices in California, engaged in multiple electronic communication on multiple occasions wherein said communication were of a false and misleading nature in the continued misrepresentation to Cellura/MEG that **Two-Fish** was the lawful owner or authorized licensor of the **eoBuy-Indiezone** **IP**-processes being sought by MEG.

**Copyright Infringement Plaintiffs' NDA-Wire Fraud:**

159.   At all times material hereto, Plaintiff Corporations in preparation for demonstrating their IP had prepared and copyrighted a Non-Disclosure Agreement (NDA) which was unique to the Plaintiff Corporations in their agreement with interested third

- 32 -

parties not to disclose certain aspects of their **IP** and trade secrets and which was required to be executed by third-parties, including potential investors and vendors or licensees.

160. On or about October 14, 2009, in performance of the **IP** theft Defendants **Rooke** and **Rogness,** in an act intended to cause economic harm to Plaintiffs, fully knowing that they were violating their Agreements with Plaintiffs did in violation of those Agreements while falsely claiming  to others their ownership-right of use in Plaintiffs' copyrights and trade secrets prepared and altered an **Indiezone** NDA by removing the name **Indiezone** and its logo-service mark and did insert the name "**Two-Fish Consulting**" as the only change to the NDA where the entire content was delivered to Cellura, Defendants DOE, ROE and others was otherwise unchanged.

161. At all times material hereto, Defendants **Rooke** and **Rogness,** in performance of the planned theft and to cause economic harm to Plaintiffs, in violation of the law, and the terms of their Agreements with Plaintiffs, failed to disclose to Plaintiffs the intended use of the altered NDA and inquiry made by Cellura on behalf of MEG and its strategic partners including, My ESPN, the United States Army, Malibu Entertainment Group, Disney Enterprises, Avinci, China Wireless, Consortium Holding, Tarsin Inc., Walmart and others.

162. At all times material hereto, Defendants **Rooke** and **Rogness,** in performance of the planned theft of Plaintiffs' **IP**, and so as to cause economic harm to Plaintiffs, in violation of the law, and the terms of their Agreements with Plaintiffs, did, upon information and belief, on multiple occasions deliver copies of the forgoing misappropriated NDA to Cellura, Defendants DOE, ROE and others.

163. In particular, on December 3, 2009, in performance of the **IP** theft and agreement to cause economic harm to Plaintiff Corporations, Defendant **Rogness** with the knowledge-permission of Defendant **Rooke,** did via interstate electronic communications delivery form Edina Minnesota commit copyright infringement of Plaintiffs' **Property** by providing an altered version of Plaintiff Corporations' NDA, falsely inserting the name **Two Fish Consulting**, without other changes to  the content of said document, attached to an e-mail sent to Cellura, in California together with the following communication  a

- 33 -

statement intended to harm Plaintiffs' business-**Property** by making Cellura falsely believe
that the **Two Fish** was the owner or had obtained a license from Plaintiff Corporations for
use of its' **IP** in the service of MEG's business needs.

164. At all times material hereto, simultaneous with the dispatch of the
misappropriated-infringed NDA on December 3, 2009, so as to cause Cellura to do business
with Two-Fish via the Internet electronic sent a message contained the following written
communication and attachment:

> **From:** Joe Rogness <joe@two----c>
> **Subject: NDA**
> **Date:** December 3, 2009 8:29:20 AM PST
> **To:** Joe Cellura <divotjrc@---t.net>
> Joe, here is a mutual NDA for our conversation today....Joe
>
> Joe Rogness
> Two Fish
> C: 612-963-4491
> E: joe@two----me

165. That on or about December 3, 2009, Cellura in reliance on the NDA, and e-
mail, from California, via the Internet returned a fully executed NDA to **Rooke** and
**Rogness** who were in Minnesota, as provided to him by them.

166. Thereafter, all times material hereto, after receiving the NDA on or about
December 3, 2009, **Rooke** who was in Minnesota, in performance of the scheme and so
as to cause Plaintiff's economic harm, and induce Cellura to do business with Cellura
and MEG while over the telephone with Cellura who was in California in response to an
inquiry by Cellura about using **eoBuy** and **Indiezone IP** did falsely reaffirm and advise
Cellura that **eoBuy** and **Indiezone** had licensed its **IP** to **Two Fish** for all purposes and
that **Two Fish** would deliver the **eoBuy** micro billing system and **Indiezone Ad-Engine**
platform to MEG and its potential clients.

167. On December 3, 2009, and continuing until at least August 2010, **Rooke**
and **Rogness** who were in Minnesota, in performance of the scheme, and so as to cause
Plaintiff's economic harm, sent Cellura who was in California, via Internet delivery,

Complaint

copies of a power point presentation containing the same or substantially similar unique processes, methods and compilation of processes for use and application with My ESPN, the United States Army, Malibu Entertainment Group, Disney Enterprises, Avinci, China Wireless, Consortium Holding Inc., Target, Tarsin Inc., Walmart; together with deal points for the use of the **eoBuy** micro-billing and **Indiezone Ad-Engine** including multiple presentations electronically delivered between Minnesota and California.

168.   The electronic dispatch across state lines of the copyrighted Plaintiffs, NDA and **IP** power point were predicate acts of criminal copyright infringement known to be a false uttering-delivered when made so as to cause Cellura to rely on and engage in commerce with **Rooke** and **Rogness** and was designed to cause economic harm to the Plaintiff Corporations by operation of the fraud, amounting to a pattern of racketeering activities wherein Cellura relied on said false statements to the detriment of MEG causing injury to Plaintiff Corporations.

**Fraudulent Release From Non-Competition Mail-Wire Fraud:**

169.   At all times prior to December 3, 2009, on or about October 14, 2009, in the performance of the illegal activity, and while intending to proceed and illegally obtain control of the Plaintiffs' **IP** so as to deliver it to MEG, My ESPN, the United States Army, Malibu Entertainment Group, Disney Enterprises, Avinci, China Wireless, Consortium Holding, General Electric, Target, Tarsin Inc., Walmart and others, Defendants **Rooke** and **Rogness**, on or about October 14, 2009, via electronic transmission from Minnesota to Fennelly in California did willfully, intentionally and falsely advise Fennelly that they were requesting **Indiezone** to *"temporarily release"* them from their Non-Competition Agreement so that they could assume a temporary consulting assignment within the music industry without being in breach of the Agreements.

170.   That at all times material hereto, Defendants **Rooke** and **Rogness** fully knowing that they had falsely advised Fennelly of their request that **Indiezone** *temporarily release* them from their Non-Compete Agreement so that they could assume

- 35 -

Complaint

a temporary consulting engagement, did falsely promise to maintain the secrecy of the Plaintiffs' **IP**, neither disclosing or using it in any manner; promising to return and otherwise maintain the Plaintiffs' operational systems including the company Servers during their absence.

171.   That on or about October 23, 2009, **Indiezone** in reliance on the foregoing representations aforesaid, and unknown to them at the time of the illegal activities *temporarily released* **Rooke and Rogness** from the Non-Competition terms of their Agreements, however, expressly demanding that they not use Plaintiffs' **IP** in any manner in the future.

172.   That unbeknownst to Fennelly, the statements were made by **Rooke** and **Rogness** were untrue and made in performance of the planned IP theft in preparation for delivery to MEG and its strategic partners including, My ESPN, the United States Army, Malibu Entertainment Group, Disney Enterprises, Avinci, China Wireless, Consortium Holding Inc., Target, Tarsin Inc., Walmart; made so as to induce Plaintiffs such that they would rely on the statements that **Rooke and Rogness** were only going to be *temporarily* engaged in outside consulting; and otherwise intended to eliminate the required handover of technology under the control of **Rooke** in his CTO position, including delivery of passwords and guidelines needed for accessing and maintaining the technical **IP** infrastructure of the Plaintiff Corporations.

173.   The statements were willful deliberate or otherwise intentional misrepresentations, and/or false representations, designed to conceal the true nature of their departure from **Indiezone** and intent to defraud, or otherwise induce reliance by Plaintiff Corporations; wherein Plaintiffs were justifiable in their reliance; and by reason of the wrongful conduct and statements made; damages have been caused to Plaintiffs where monetary relief alone will not compensate Plaintiffs in their losses.

174.   That at all times material hereto, Plaintiffs have refused to provide a release from the terms of the IP Agreements and the terms of secrecy, non-disclosure and use and entered into with **Rooke and Rogness,** where Defendants have and continue to unlawfully

- 36 -

Complaint

1  misappropriate, infringe or otherwise use said **IP** without permission, consent or other lawful

2  right.

3  ### DEFENDANTS' INTERSTATE THEFT OF PHYSICAL PROPERTY;
   ### DEFENDANTS' COMPUTER SABOTAGE; MAIL FRAUD

4

5  **Interstate Theft of Plaintiffs' Property in  excess of $5,000.00:**

6      175.  At all times material hereto, Plaintiffs maintained a single restricted written

7  copy of the Disaster Recovery Plan ("DRP") for Plaintiff Source Code and any other

8  information or resources related to maintain the integrity of the technological systems and

9  files as developed by **Rooke** as CTO and the **eoBuy** and **Indiezone** staffs.

10      176.  At all times material hereto, DRG was maintained so as to implement and

11  protect against loss of the Source Code and other **IP** files which took in excess of 10 years

12  to develop with a development cost in excess of $20,000,000.00.

13      177.  At all times material hereto, Defendants **Rooke** and **Rogness** knew and were

14  aware that in the event the system would malfuction that without a DRP and without the

15  hand over, for the reason of the personal  processes known to Rooke and incorporated in the

16  system, the system could not be restored in the event of a systems failure.

17      178.  At all times material hereto Defendants **Rooke** and **Rogness** knew and were

18  are that they could not beat Plaintiffs with the speed to market they needed to be first unless

19  they could disrupt-delay Plaintiffs' deployment of its **IP**; K new that they would be unable

20  to claim first right of authorship; and knew the cloned version would  openly apparent to the

21  public and the USPTO.

22      179.  That in preparation of the **IP** theft, so as to obtain an economic advantage and

23  delay-disrupt Plaintiff deployment of its **IP**, in or about July 2009, Defendants **Rooke** and

24  **Rogness** while visiting the California offices of **eoBuy-Indiezone** did, without the

25  permission, consent or authority of Plaintiff Corporations, illegally obtain and remove from

26  the California facilities of Plaintiffs' only version of the DRP other **IP** files as developed by

27  Plaintiffs employees in the creation of the joint deployment of the **eoBuy-Indiezone Ad-**

28  **Engine** wherein Plaintiff are informed and believe,  Defendants **Rooke** and **Rogness**

transported said Property across state lines from California to a location in Edina Minnesota so as to facilitate their illegal use-misappropriation-infringement of Plaintiffs' IP and otherwise interfere with the ability of Plaintiff to be first to deploy its IP into the stream of commerce.

180. Unbeknownst to Plaintiff Corporations, in performance of their scheme the promises of **Rooke** and **Rogness** previously made and concerning their representations that they would abide by their Agreements and the reaffirmation of those promises in September of 2008, the statements made in October 2009, that they were only going to *temporarily* engage in a consulting engagement; their promises to maintain the secrecy and refrain from use of the Plaintiffs' IP; their promise to maintain the **Indiezone** Servers and return to their employment with **Indiezone**, each of these statements were knowingly false when made by them to induce Plaintiffs to release them from their Non-Competition Agreement; made so as to conceal the truth of the actual reason for their departure and otherwise eliminate the need for an early turnover of the Server and a comprehensive technical hand-off of the CTO office; made so as to delay the handover of the technical infrastructure of the Plaintiff Corporations joint deployment strategies; and made so as to maintain an economic advantage over the Plaintiff Corporations; and so as to conceal their sabotage and the true provenance of the **IP**.

181. In response thereto, Fennelly reminded **Rooke** and **Rogness** of their promises not to infringe-use Plaintiffs' **IP**, and on December 17, 2009, **Indiezone** requested a turnover of the Server and transfer, access codes, e-mails and all related data for the continued operation and deployment of the Plaintiffs' **IP** as well as a technology hand-off from **Rooke** regarding the **Indiezone** CTO office.

182. At all material times hereto, instead of honoring their Agreements on or about December 17, 2009, in violation of their Agreements with Plaintiff Corporations so as to conceal and commit the **IP** theft-infringement-misappropriation of Plaintiffs' **Property**, **Rooke** and **Rogness** in the performance of their plan agreed between themselves to sabotage the **Indiezone** Server by intentionally misdirecting, or otherwise deliberately

- 38 -

1    changing internal passwords, disabling access protocols; modifying the system in manner
2    which could not be detected but would disable the systems future processing capability; by
3    failing to maintain or provide guidelines to maintain access and security certificates; and by
4    refusing to conduct a technical hand-off under established industry protocols.

5       183.   At all material times hereto, on or about December 29, 2009, Defendants
6    **Rooke** and **Rogness,** in furtherance of their planned theft of Plaintiffs' **IP,** agreed to commit
7    and did commit computer sabotage-espionage-theft by means of both electronic and
8    physical computer tampering, in violation of 18 USC §§1029 and 1030, where by intending
9    to sabotage the Server and cause economic harm, Defendants **Rooke** and **Rogness** illegally
10   accessed the Server intentionally misdirecting, or otherwise deliberately changing internal
11   passwords and removing-eliminating- erasing in excess of 20,000 electronic
12   communications--emails which were the **Property** of Plaintiffs; and did copy said **Property**
13   e-mails in both electronic and physical form thereof wherein by doing so each exceeding
14   their authorized access to the Server.

15      184.   Thereafter, in performance of the scheme, on or about December 29, 2009,
16   after engaging in the foregoing illegal conduct, said Defendants, **Rooke** and **Rogness** did
17   from the State of Minnesota dispatch said Server for delivery to Plaintiff by placing or
18   causing the same to be placed into an authorized mail carriers for interstate delivery into the
19   State of California.

20      185.   At all relevant times, by reason of the foregoing, **Rooke** and **Rogness**
21   intentionally eliminated Plaintiffs' ability to maintain the **Indiezone IP** as stored in the
22   Server system and unique deployment environment and thereby effectively prevented
23   **Indiezone** from raising investment funds and communicating with its vendors and entering
24   the e-commerce markets.

25      186.   At all times material hereto, said acts were willful and intended to prevent
26   Plaintiffs' market deployment of the discrete jointly developed techniques of **eoBuy** and
27   **Indiezone** methodologies and processes so as to defraud Plaintiffs and so as to cause
28   economic harm to Plaintiff Corporations and others.

Complaint

## ROOKE, ROGNESS, HAZEL, ASHKAR, OLIVER, AND US BANK'S
## FORMATION OF AN ASSOCIATION-IN-FACT RICO ENTERPRISE

187.   After ensuring the elimination of Plaintiffs' ability to access its IP deployment environment, in the performance of the illegal scheme to be the first to market with Plaintiffs' stolen IP while falsely claiming it as their own, Defendants **Rooke** and **Rogness,** who form the hub of the criminal activity, after advancing the **IP** theft and intended injury to Plaintiffs' business from inside Plaintiff Corporations, then conspired to obtain an agreement with Defendants **Hazel, Ashkar** and **Oliver** so as to fund the use of the misappropriated **IP.**

188.   Commencing in or about June 2009, Defendants **Rooke** and **Rogness** told **Hazel,** and **Ashkar** and **Oliver** of their plans to take and claim Plaintiffs' **IP** as their own; their plans to prevent Plaintiffs from establishing a proper claim and title to its **IP**; their plans to keep Plaintiffs out of the e-commerce market; their plans to eliminate the written code and trade secret manuals; their plan to sabotage Plaintiffs' server so as to prevent-eliminate Plaintiffs ability to enter interstate markets ahead of them; and their plans for financing, raising funds in support of their illegal activities by falsely claiming Plaintiffs' **IP** as their own, **Rooke** and **Rogness** requested the of assistance-aid of **Hazel, Ashkar** and **Oliver** in obtaining the funding and starting a series of corporations to present Plaintiffs' **IP** as their own so as to engage in commercial profit for themselves.

189.   Notwithstanding their knowledge of the illegal conduct required of them, **Hazel, Ashkar** and **Oliver** agreed to aid/assist **Rooke** and **Rogness** in the misappropriation-infringement theft of Plaintiffs' **Property** by soliciting investors world-wide, via the Internet and US mails.

190.   In performance and illegal use of the **IP** transactions, at a time prior to November 2011, Defendants **Rooke** and **Rogness** entered into an negotiations for an agreement with **US Bank** for the purpose of processing the **AdEngine** financial exchange-cash rewards between merchant-advertisers and consumers, wherein **US Bank,** after the fact knew, and became aware of Plaintiffs' claims for the reason that they had been informed by Plaintiffs that its **IP** was being infringed and despite said warnings **US Bank** continues in

-- 40 --

1   the partnership with the Defendants **Rooke**, **Rogness** and **Jingit LLC** causing injury to

2   Plaintiffs business and **Property.**

## THE RICO DEFENDANTS' ILLEGAL FUNDING
## AND REINVESTMENT INTO THE JINGIT ENTERPRISE

5       191.   Having illegally secured the Plaintiffs' **Property** through the agreed predicate acts

6   accomplished, via a pattern of racketeering activity by means of computer theft and sabotage; mail

7   fraud, wire fraud and other illegal racketeering activities, the ***RICO Defendants*** commencing in or

8   about January 2010, raised and are continuing to raise capital to fund the illegal activities through

9   placement of private debt and equity instruments using **Jingit Holdings** f/k/a 7 Ventures.

10      192.   The placement of theses private debt instruments were made possible through

11  written solicitations delivered by the ***RICO Defendants*** for payment into **Jingit Holdings** which

12  were accomplished both intra-interstate domestic and foreign investment memorandums sent over

13  the Internet and through the US mails by or caused to be so dispatched by the ***RICO Defendants.***

14      193.   The scheme involves the individual and collective acts of Defendants **Rooke**,

15  **Rogness, Hazel, Ashkar** and **Oliver** in seeking out investors and in knowingly making false

16  statements to investors and in the investment memorandums concerning non-existent ownership

17  of copyright, trade-secrets, patent and trademark rights as alleged to be owned by **Jingit LLC.,**

18  and licensed to the other ***Jingit Entities,*** wherein the **IP** is actually original to, and is the

19  exclusive **Property** of Plaintiff Corporations.

20      194.   The funding memorandum falsely asserts an exclusive right of ownership to

21  Plaintiffs' **Property**, whereby the Defendants via **Jingit Holding** falsely claim to be the

22  inventors with right of authorship of the Plaintiffs' **Property** escalating to improperly

23  asserting the pending registration of the copyrights, trademarks and patents commencing

24  2010 and continuing to date; wherein in addition the Defendants **Rooke, Rogness, Hazel,**

25  **Ashkar** and **Oliver** falsely assert that **Jingit Holding**'s has been granted USPTO

26  provisional approvals of Plaintiffs' **Property** falsely claiming it as Patentable works.

27      195.   That at all times herein after mentioned, on February 18, 2010, unbeknownst to

28  investors and under the cover of **7 Ventures**, Defendants **Rooke, Rogness** and **Ashkar** as officers

Complaint

of 7 **Ventures**, in furtherance of the ***Jingit Enterprise***, and so as to cause Plaintiffs economic harm, did from the State of Minnesota, electronically file a Regulation D Offering statement with the United States Securities and Exchange Commission wherein the sum of $115,000.00 was raised by falsely claiming in the placement memorandum ownership of Plaintiffs' **IP**.

196. That at all times herein after mentioned, on April 8, 2010, unbeknownst to investors under the cover of **Jingit Holding f/k/a 7 Ventures**, Defendants **Rooke**, **Rogness** and **Ashkar** as officers of **Jingit Holding**, in furtherance of the ***Jingit Enterprise***, and so as to cause Plaintiffs economic harm, did from the State of Minnesota, electronically file a Regulation D Offering statement with the United States Securities and Exchange Commission wherein the sum of $385,000.00 was raised by falsely claiming in the placement memorandum ownership of Plaintiffs IP.

197. That at all time herein after mentioned, on January 6, 2011, unbeknownst to investors under the cover of **Jingit Holding** Defendants **Rooke**, **Rogness** and **Ashkar** as officers of **Jingit Holding**, in furtherance of the ***Jingit Enterprise***, and so as to cause Plaintiffs economic harm, did from the State of Minnesota, electronically file a Regulation D filing statement with the United States Securities and Exchange Commission wherein the sum of $280,000.00 was raised by falsely claiming in the placement memorandum ownership of Plaintiffs' **IP**.

198. That at all times herein after mentioned, on February 10, 2011, unbeknownst to investors under the cover of **Jingit Holding** Defendants **Rooke**, **Rogness**, **Hazel**, and **Ashkar** as officers of **Jingit Holding**, in furtherance of the ***Jingit Enterprise***, and so as to cause Plaintiffs economic harm, did from the State of Minnesota, electronically file a Regulation D Offering statement with the United States Securities and Exchange Commission wherein the sum of $385,000.00 was raised by falsely claiming ownership of Plaintiffs' **IP**.

199. That at all time herein after mentioned, on November 19, 2012 unbeknownst to investors under the cover of **Jingit Holding** Defendants **Rooke**, **Rogness**, **Ashkar** and **Oliver** as officers of **Jingit Holding**, in furtherance of the ***Jingit Enterprise***, and so as to cause Plaintiffs

Complaint